# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GEORGENE SIROKY, ) | |
|         Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 15-1170 |
| ) | |
| ALLEGHENY COUNTY, ) | |
| ) | |
|         Defendant. ) | |

## OPINION

**CONTI, Chief District Judge**

### I. Introduction

In this discrimination lawsuit, which is set for trial in May 2018, plaintiff Georgene Siroky ("Siroky" or "plaintiff") alleges that the Allegheny County Office of the Public Defender ("Office of the Public Defender" or "defendant") discriminated against her on the basis of her age by denying her raises and promotions in favor of younger attorneys in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626 and 28 U.S.C. § 1331. (ECF No. 1 ¶ 9.) On September 1, 2017, the Office of the Public Defender filed a Motion in Limine (ECF No. 80) which requested that this court exclude as an exhibit at trial statements made by Elliot Howsie ("Howsie"), Allegheny County Chief Public Defender, that appeared in an article published by The Post-Gazette on March 17, 2013, and authored by Paula Reed Ward ("Ward"). The article discusses the management of the Office of the Public Defender by Howsie after defendant was sued by the American Civil Liberties Union ("ACLU") in 1996. (ECF No. 117 ¶ 5.) In that lawsuit, the ACLU alleged that the Office of the Public Defender was ineffectively run, and therefore, it deprived indigent criminal defendants of their constitutional rights to counsel. (ECF No. 117-1 at 2-3.)

Ward interviewed Howsie for the article. The alleged statements at issue are the following:

> "People are reluctant to change,"…[Mr. Howsie] said. "Now, we're requiring the more senior attorneys to do the heavy lifting. I'm not interested in firing anyone. But I do have an interest in making people so uncomfortable that they leave."

(ECF No. 117-1 at 3.) During a final pretrial conference held on November 1, 2017, the court ruled that Howsie's statements in the article were hearsay and would only be admissible at trial if Ward testified about the statements made to her by Howsie. (ECF No. 121-2.)

On November 3, 2017, a Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (the "Subpoena") was issued to Ward on behalf of Siroky which seeks to compel Ward to testify about Howsie's statements to her and seeks Ward's notes and reporting material with respect to the article. On December 14, 2017, Ward and The Post-Gazette filed a Motion to Quash Subpoena pursuant to Federal Rule of Civil Procedure 45 (ECF No. 117) in which they argue that the subpoena violated the qualified reporter's privilege guaranteed by the First Amendment to the United States Constitution. On January 11, 2018, Siroky filed a response to Motion to Quash Subpoena. On February 8, 2018, Ward and The Post-Gazette filed a reply brief. (ECF No. 124.)

On February 15, 2018, the court held a hearing with respect to the motion to quash. After hearing from the movants and the parties, the court—in order to determine whether there was another person who could testify about Howsie's alleged statements and, therefore, avoid the need to subpoena Ward—permitted Siroky to serve two interrogatories on Howsie about whether there were other persons present when he was interviewed by Ward. The court also permitted Ward and The Post-Gazette to file a supplemental brief addressing decisions Siroky raised for the first time at the hearing. On February 20, 2018, Ward and The Post-Gazette filed their supplemental brief. (ECF No. 126.) On the same day, Siroky filed a motion for leave to file a supplemental brief, which Ward and The Post-Gazette opposed. (ECF Nos. 125, 128.) The court granted Siroky's motion, permitted her to file a supplemental brief, and permitted Ward and The Post-Gazette to

file a response in opposition to that supplemental brief. (ECF No. 129.) On February 21, 2018, Siroky filed her supplemental memorandum. (ECF No. 130.) On February 28, 2018, Ward and The Post-Gazette filed their response. (ECF No. 131.)

The motion to quash having been fully briefed and argued is now ripe to be decided by the court.

## II. Federal Rule of Civil Procedure 45

A subpoena served during discovery must fall within the scope of discovery set forth in Federal Rule of Civil Procedure 26(b)(1). Green v. Cosby, 314 F.R.D. 164, 169 (E.D. Pa. 2016). Rule 26(b)(1) provides:

> *(1) Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

FED. R. CIV. P. 26(b)(1). Federal Rule of Evidence 45(d)(3) provides that a court "must quash or modify a subpoena that…requires disclosure of privileged or other protected matter, if no exception or waiver applied." FED. R. CIV. P. 45(d)(3).

The court in Green described the procedure that should be followed when a party challenges a subpoena served during discovery as follows:

> "The serve-and-volley of the federal discovery rules govern the resolution of a motion to quash." In re Domestic Drywall, 300 F.R.D. at 239 (internal quotation marks omitted). First, the subpoenaing party must demonstrate that its requests fall within the general scope of discovery defined in Rule 26(b)(1). Id. Accordingly, the subpoenaing party may only seek "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). If the general scope of discovery encompasses the requests of the subpoenaing party then the burden shifts to the party opposing the

3

subpoena to establish that Rule 45(d)(3) provides a basis to quash the subpoena. See In re Domestic Drywall, 300 F.R.D. at 239. Rule 45(d)(3)(A) requires a court to quash or modify a subpoena that:

> (i) fails to allow a reasonable time to comply;
>
> (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
>
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
>
> (iv) subjects a person to undue burden.
>
> Fed. R. Civ. P. 45(d)(3)(A)….The burden of the party opposing the subpoena "is particularly heavy to support a motion to quash as contrasted to some more limited protection such as a protective order." In re Domestic Drywall, 300 F.R.D. 234 at 239 (internal quotation marks omitted).

Green, 314 F.R.D. at 169-70.[1]

### III. Discussion

---

[1] Another court has explained:

> [T]he Court's power to quash or modify a subpoena inherently lies within the provisions to enter a protective order under Fed.R.Civ.P. 26(c). "[U]nder Rule 45(d)(1), a person who has been served with a discovery subpoena may move either for a protective order under Rule 26(c) or for an order quashing or modifying the subpoena under Rule 45(c)(3)." Pepsi–Cola Metropolitan Bottling Co., Inc. v. Insurance Co. of N. America, No. 10–222, 2011 WL 239655, at *2 (E.D.Pa., Jan.25, 2011). "Typically, analysis of Rule 45(c)(3)(A) motions is similar to analysis of Federal Rule of Civil Procedure 26(c) motions for a protective order." Municipal Revenue Services, Inc. v. Xspand, Inc., No. 07–42, 2007 WL 1875793, at * 1 (E.D.Pa., Jun.27, 2007). Rule 26(c)(1) provides that a court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including the following: (A) forbidding the disclosure of discovery; and (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters. Fed.R.Civ.P. 26(c)(1).

Saviant Sys., LLC v. Creston Elecs., Inc., Civ. Action No. 12-51, 2012 WL 987404, at *3 (E.D. Pa. Mar. 22, 2012).

The Post-Gazette argues that the court must quash the subpoena issued to Ward by Siroky because the testimony and documents sought in that request are subject to the qualified reporter's privilege. The First Amendment to the United States Constitution[2] and Federal Rule of Evidence 501[3] are the sources of a qualified reporter's privilege. Riley v. City of Chester, 612 F.2d 708 (3d Cir. 1979). In Riley, the court explained:

> The strong public policy which supports the unfettered communication to the public of information, comment and opinion and the Constitutional dimension of that policy, expressly recognized in Branzburg v. Hayes, lead us to conclude that journalists have a federal common law privilege, albeit qualified, to refuse to divulge their sources. Such a privilege has also been recognized by many other courts which have considered this question following the decision in Branzburg v. Hayes. See, e. g., Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 436 (10th Cir. 1977); Baker v. F & F Investment, supra; Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co., 455 F.Supp. 1197, 1203 (N.D.Ill.1978); Zerilli v. Bell, supra; Altemose Construction Co. v. Building & Construction Trades Council, 443 F.Supp. 489, 491 (E.D.Pa.1977); Gilbert v. Allied Chemical Corp., 411 F.Supp. 505, 508 (E.D.Va.1976).

---

[2] The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

[3] Federal Rule of Evidence 501 provides:

The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise:

• the United States Constitution;

• a federal statute; or

• rules prescribed by the Supreme Court.

But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

FED. R. EVID. 501.

5

Riley, 612 F.3d at 715. The qualified reporter's privilege has been "adopted and recognized by Pennsylvania state and federal courts[.]" Kitzmiller v. Dover Area Sch. Dist., 379 F.Supp.2d 680, 685 (M.D. Pa. 2005). Once the privilege has been properly asserted, it may be overcome by a showing that:

1. The information sought is material, relevant, and necessary;

2. There is a strong showing that it cannot be obtained by alternative means; and

3. The information is crucial to the party's case.

Id. "Essentially the question for the court is whether there is a compelling need for production that should override the privilege." 2 Christopher B. Mueller, Laird C. Kirkpatrick, Federal Evidence, § 5:46 (3d ed. 2007).

To resolve the motion to quash in this case, the court must first determine whether the qualified reporter's privilege applies to Ward's testimony and notes, and, then, whether Siroky can overcome the privilege.

### A. Whether the qualified reporter's privilege applies to Ward's testimony, interview notes, and reporting material

Here, Siroky argues that the privilege does not apply in this case because the information sought, i.e., a verification of Howsie's statements to Ward through Ward's testimony and interview notes, is not *confidential* information. Siroky argues that the privilege only applies to "the identity of sources and in some circumstances unpublished material." (ECF No. 121 at 3.) Siroky's arguments are unavailing. The qualified reporter's privilege applies in civil and criminal cases. In re Maykuth, Civ. Action No. 05-0228, 2006 WL 724241, at *2 (E.D. Pa. Mar. 17, 2006) (citing United States v. Cuthbertson, 630 F.2d 139, 147 (3d Cir. 1980) ("CBS's interest in protecting confidential sources, preventing intrusion into the editorial process, and avoiding the possibility of

6

self-censorship created by compelled disclosure of sources and unpublished notes does not change because a case is civil or criminal."); United States v. Burke, 700 F.2d 70 (2d Cir. 1983)). It "protects both confidential and non-confidential sources," and "published and unpublished information[.]" Maykuth, 2006 WL 724241, at *2 (citing United States v. Criden, 633 F.2d 346, 358 (3d Cir. 1980) (recognizing that "defendants probably should be required to prove less to obtain the reporter's version of a conversation *already voluntarily disclosed by the self-confessed source* than to obtain the identity of the source itself.") (emphasis added); United States v. Cuthbertson, 630 F.2d 139, 147 (3d Cir. 1980) (holding that "the privilege extends to unpublished materials in the possession of CBS….Of course, the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case."); Shoen v. Shoen, 5 F.3d 1289, 1295-96 (9th Cir. 1993) (holding that "the journalist's privilege applies to a journalist's resource materials even in the absence of the element of confidentiality").

In Parsons v. Watson, 778 F.Supp. 214, 215 (D. Del. 1991), the plaintiff was sanctioned by his employer for disparaging statements he made about his employer to a newspaper reporter. Three other persons, along with the plaintiff and the reporter were present when the disparaging statements were made. Id. The plaintiff sued his employer alleging "various state and federal constitutional violations, including…violations of plaintiff's freedom of speech under the First Amendment." Id. Specifically, the plaintiff alleged that the newspaper reporter misquoted him. Id. The plaintiff subpoenaed the newspaper reporter to determine whether he was misquoted and whether a second article was written to correct the misquotations. Id. The newspaper reporter argued the subpoena should be quashed on the basis of the qualified reporter's privilege. Parsons, 778 F.Supp. at 216.

7

The court explained that the qualified reporter's privilege was first applied to a reporter's refusal to divulge a *confidential* source. Id. at 217 (citing Riley, 612 F.2d at 715). The court then recognized that the "privilege applies when a party seeks to compel production of unpublished information or of a reporter's resource materials." Id. (citing Cuthbertson, 630 F.2d at 147). Most importantly to this case, the court in Parsons recognized that the privilege was extended to "where a party seeks to compel a journalist to authenticate or verify published quotations." Id. (citing United States v. Markiewicz, 732 F.Supp. 316, 318 (N.D.N.Y.1990); Nat'l Labor Relations Bd. v. Mortensen, 701 F.Supp. 244, 246–47 (D.D.C.1988); United States v. Blanton, 534 F.Supp. 295, 297 (S.D. Fla. 1982)).

In some situations, the party who is seeking the information must make a stronger showing to overcome the privilege. Parsons, 778 F.Supp. at 217-18. For example, a stronger showing by the party seeking information is required if the information sought is confidential. Id. Similarly, a stronger showing will be required in a *civil* case as opposed to a *criminal* case. Id. On the other hand, "the courts may require a lesser showing where the journalist is a party to the lawsuit rather than a third-party witness." Id. The court in Parsons—recognizing that the information sought in the case was not confidential—explained:

> While the Court agrees with the court in La Rouche Campaign, 841 F.2d at 1181, that it is more difficult to identify the First Amendment interest at stake when a reporter is not asked to reveal confidential information, **the Court nevertheless believes that the privilege is available even when confidential information is not sought**. Rather, "the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case." Cuthbertson, 630 F.2d at 147. The Court finds that Carolyn Lewis possesses a First Amendment interest, albeit a somewhat lesser interest than that possessed by a journalist seeking to prevent disclosure of a confidential source. Lewis' interest must be weighed against the competing interests of the parties to determine whether the reporter's privilege is available to her.

Parsons, 778 F.Supp. at 218 (emphasis added & footnotes omitted).

The court applied the Riley factors to the case and reasoned that the information sought by the plaintiff was "significant" because the article at issue "formed the basis for the disciplinary action against plaintiff and that…[he] denied making the statements attributed to him." Id. The plaintiff, however, did not make any effort to obtain the information from the other sources, i.e., the other three people who were present with the plaintiff and the newspaper reporter when the plaintiff allegedly made the disparaging remarks. Id. at 219. The court explained: "When there is a clear alternative source for the information sought, the journalist may invoke the privilege to avoid compelled testimony." Id. The plaintiff "himself was a source of information regarding exactly what was said during the conversation." Id. The reporter's testimony "while relevant, would be cumulative of the testimony of the participants in the conversation." Parsons, 778 F.Supp. at 219. The court granted the motion to quash the subpoena on that basis. Id.

Other courts have applied the qualified reporter's privilege to nonconfidential information; indeed, it is "settled law" in the Second Circuit "that a journalist possesses a qualified privilege protecting him or her from the compelled disclosure of even nonconfidential materials." United States v. Treacy, 639 F.3d 32, 42 (2d Cir. 2011) (citing Chevron Corp. v. Berlinger, 629 F.3d 291, 306-07 (2d Cir. 2011); Gonzales v. NBC, 194 F.3d 29, 35 (2d Cir. 1999)). The Second Circuit Court of Appeals explained:

> "even where there [is] no issue of betrayal of a promised confidence, ... 'wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties—particularly if potential sources were deterred from speaking to the press, or insisted on remaining anonymous, because of the likelihood that they would be sucked into litigation' [and] ... unrestricted litigant access to press files would create socially wasteful incentives for press entities 'to clean out files containing potentially valuable information lest they incur substantial costs' of subpoena compliance, and would risk 'the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties.'"

Treacy, 639 F.3d 32, 42 (2d Cir. 2011) (quoting Chevron, 629 F.3d at 307). The Second Circuit

Court of Appeals is not alone in recognizing that the qualified reporter's privilege may apply to nonconfidential information. "Several…[courts of appeals] have considered similar arguments and extended the newsreporters' privilege to nonconfidential work product, either in civil or criminal cases." United States v. Smith, 135 F.3d 963, 970 n.2 (5th Cir. 1998) (citing Shoen, 5 F.3d at 1294–95 (civil case); United States v. LaRouche Campaign, 841 F.2d 1176, 1182 (1st Cir. 1988) (criminal case); von Bulow v. von Bulow, 811 F.2d 136, 143 (2d Cir. 1987) (implying applicability in civil cases); Cuthbertson, 630 F.2d at 147 (criminal case); but see In re Shain, 978 F.2d 850, 853 (4th Cir.1992) (refusing to apply the qualified reporter's privilege in a criminal case to nonconfidential information). The Post-Gazette cited to decisions from district courts in other circuits in which courts applied the qualified reporter's privilege to nonconfidential information. (ECF No. 124 (citing In re Subpoena to Goldberg, 693 F.Supp. 2d 81 (D.D.C. 2010); Hutira v. Islamic Republic of Iran, 211 F.Supp. 2d 115 (D.D.C. 2002); Re/Max Int'l, Inc. v. Centry 21 Real Estate Corp., 846 F.Supp. 910 (D. Colo. 1994); United States v. Blanton, 534 F.Supp. 295 (S.D. Fla. 1982)).

In this case, like in Parsons, the information sought is the authentication or verification of a published quotation from an identified source, i.e., nonconfidential information. In accordance with Parsons, a journalist may assert the qualified reporter's privilege to protect that information. The court must then apply the Riley factors to determine whether the party seeking the information, i.e., Siroky in this case, can overcome the privilege.

### B. The Riley Factors Applied in this Case with Respect to Ward's Deposition Testimony[4]

---

[4]  Because this is a civil action and Ward and The Post-Gazette are not parties to this case, Siroky must make a stronger showing to overcome the privilege. On the other hand, the information sought is nonconfidential, which lessens Siroky's burden.

## 1. Material, relevant, and necessary information that is crucial to the very heart of Siroky's claim[5]

The Third Circuit Court of Appeals has explained that "statements of a person involved in the decisionmaking process that reflect a discriminatory…animus" that are "not made at the same time as the adverse employment decision" constitute "circumstantial evidence that an impermissible motive substantially motivated the decision." Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002). Siroky alleges that she was not provided a paygrade promotion *because of her age*. It is alleged that near the time that the decisions about the paygrade promotions were made, Howsie made ageist statements to Ward that appear in The Post-Gazette article. The statements reported in the article are:

> "People are reluctant to change,"…"Now, we're requiring the more senior attorneys to do the heavy lifting. I'm not interested in firing anyone. But I do have an interest in making people so uncomfortable that they leave."

(ECF No. 117-1 at 3.) The foregoing statements—if made by Howsie to Ward—would be circumstantial evidence that Howsie had a discriminatory animus against "more senior attorneys," i.e., "older attorneys."[6] Under those circumstances, if a reasonable jury believed that Howsie made those statements, it could rely upon that evidence to conclude that Siroky did not receive a paygrade promotion *because of her age*. Ward's testimony about whether Howsie actually made those statements to Ward is, therefore, material, relevant, and crucial to the very heart of Siroky's

---

[5] The court will address the first and third Riley factors together because their analyses involve significant overlap.

[6] Siroky also argues that Ward's testimony "can be used to assist the jury in making credibility determinations about Mr. Howsie and his motivations." (ECF No. 121 at 6.) To the extent Ward testifies that Howsie made the statements she attributed to him in her article, that testimony is relevant with respect to a *substantive* issue in the case and admissible for that purpose. Siroky may also rely upon that evidence to impugn Howsie's credibility if he testifies to the contrary.

claim, i.e., she was not given a paygrade promotion *because of her age*.

Ward's testimony is *necessary* because, as this court explained at the pretrial conference, The Post-Gazette article[7] is inadmissible hearsay. "[G]enerally, newspaper articles and television programs are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted and statements in newspapers by individuals other than the article's author often constitute double hearsay." Sec. and Data Techs., Inc. v. Sch. Dist. of Phila., 145 F.Supp.3d 454, 463 (E.D. Pa. 2015). Howsie's statements to Ward are admissible as an admission by a party opponent, pursuant to Federal Rule of Evidence 801(d)(2). The article itself, however, constitutes inadmissible hearsay. May v. Cooperman, 780 F.2d 240, 262 n.10 (3d Cir. 1985) ("Ordinarily, when offered to prove the truth of the matters stated therein, newspaper articles are held inadmissible as hearsay."). Ward's testimony, therefore is *necessary* for Siroky to be able to introduce into evidence the statements that Howsie allegedly made to Ward that reflect a discriminatory animus and are circumstantial evidence that Siroky did not receive a paygrade promotion because of her age.

Having determined that Ward's testimony is material, relevant, necessary, and crucial to Siroky's case, the first and third Riley factors weigh heavily in favor of overcoming the presumption that Ward's testimony is subject to the qualified reporter's privilege.

**2. Strong showing that it cannot be obtained by alternative means**

Although Siroky may have alternative means to prove age discrimination in this case, Howsie's statements would be material to support her claim. Siroky does not have any means other

---

[7] "Printed material purporting to be a newspaper" is "self-authenticating[,]" i.e., it requires "no extrinsic evidence of authenticity in order to be admitted." FED. R. EVID. 906(6). "Establishing the authenticity of the publication may, of course, leave still open questions of authority and responsibility for items therein contained." FED. R. EVID. 906(6) Advisory Committee Notes.

12

than Ward's testimony to prove that Howsie actually made those statements to Ward. Howsie in his deposition testified as follows with respect to those statements:

> I was asked, well, what are some of the things that you see since your arrival that are problematic. One aspect of the office that has been problematic is that the more experienced attorneys have worked themselves into the diversionary courts and into places in the office where the majority of those cases do not require the same type of effort and/or experience as cases in other divisions.
>
> I was questioned as to, well, what would you do about that. I said, well, the more senior attorneys need to be in a position where they're dealing with the more serious cases, and the new hires need to be in a position where they can begin to get their feet up under them, become acclimated to the practice of the law, the expectations of the public defender's office.
>
> So to that end I'm not interested in firing anyone. I'm not looking to fire anyone. I'm not looking to do anything to anyone, but the culture has to change in the office. The expectation has to change in the office. The quality of the service has to change. The people that are able to rise to the occasion will be fine. The people who are unable to rise to the occasion, it is my hope that they will either be uncomfortable with the changes that are occurring and they will either get up to speed to get out because change is coming.
>
> **<u>It was never a discussion about me making people uncomfortable and running them out of the office. I had no interest in running anyone out of the office. My interest is making sure that we have a standard. I'm in the office where everyone is performing at that standard or hopefully, hopefully above.</u>**

(ECF No. 131-1 at 1 (emphasis added).) Based upon the foregoing, Howsie is likely to testify at trial that he did not tell Ward that he intended to make attorneys, i.e., "more senior attorneys" who "are reluctant to change," "so uncomfortable that they leave." (ECF No. 117-1 at 3.) The evidence presented by defendant shows that there were no other persons present when Ward interviewed Howsie. (ECF No. 127-1.) Siroky, therefore, cannot prove that Howsie made the statements reported in Ward's article without presenting Ward's testimony (assuming Ward would testify that Howsie did in fact make those statements to her). Siroky made a strong showing that Howsie's

statements as reported in The Post-Gazette article cannot be obtained by alternative means.[8] This factor weighs in favor of overcoming the presumption that Ward's testimony is subject to the qualified reporter's privilege.

### 3. Conclusion[9]

Ward and The Post-Gazette properly asserted the qualified reporter's privilege in this case. After applying the Riley factors, this court must conclude that the privilege was overcome by Siroky with respect to the issue whether Ward should be compelled to testify. The information

---

[8] The strong showing in this case is especially apparent in contrast to Parsons. In Parsons, the plaintiff was trying to prove that the reporter misquoted him. Parsons, 778 F.Supp. at 215. He could rely upon his own testimony or the testimony of the three other persons present to prove that he was misquoted. Id. at 219. Because the plaintiff had "an alternative source…for the information sought" the court granted the motion to quash finding that the qualified reporter's privilege applied and the plaintiff's "conclusory assertions" did not overcome the privilege. Id. Here, no one else was present at Ward's interview of Howsie. Siroky—without Ward's testimony—cannot, therefore, prove that Howsie made those statements to Ward. (ECF No. 127-1.)

[9] The Post-Gazette in its reply brief relies upon four decisions in support of its argument that Siroky cannot overcome the qualified reporter's privilege in this case. Each of those decisions, however, is distinguishable from this case. In re Subpoena to Goldberg, 693 F.Supp.2d 81 (D.D.C. 2010) (quashing the subpoena to a non-party journalist because (1) there was a considerable amount of evidence with respect to the issue already in the record, and, therefore, the testimony by the journalist would be "unreasonably cumulative or duplicative," and (2) the requesting party did not exhaust other sources for the information); Hutira v. Islamic Republic of Iran, 211 F.Supp.2d 115 (D.D.C. 2002) (quashing the subpoena because the party requesting the information from the journalist "failed to exhaust possible alternative sources of obtaining the pertinent information"); Re/Max Int'l, Inc. v. Century 21 Real Estate Corp., 846 F. Supp. 910 (D. Colo. 1994) (quashing a subpoena issued to a journalist because the evidence was sought to impeach a witness, but the evidence had de minimis impeachment value and the journalist was not the only source of the impeachment evidence); United States v. Blanton, 534 F. Supp. 295 (S.D. Fla. 1982) (quashing a subpoena issued to a journalist because proper service was not made on the journalist and the government "failed to exhaust or make reasonable attempts to exhaust non-media sources for the information sought or equivalent information and failed to negotiate in good faith with the reporter's counsel").

14

sought from Ward and The Post-Gazette, i.e., Ward's testimony to show that Howsie made the statements Ward attributed to him in her Post-Gazette article, is at the very heart of Siroky's age discrimination claim and cannot be obtained from any other source. Under those circumstances, the motion to quash will be denied with respect to the testimony of Ward.

### C. Ward's Notes and Reporting Material from her Interview of Howsie

The subpoena issued to Ward by Siroky included a request for Ward's notes and reporting material from her interview of Howsie. At this stage, the court is unable to conduct a meaningful analysis under Riley about whether the qualified reporter's privilege was overcome with respect to those notes and the reporting material. Siroky will be permitted to depose Ward about whether Howsie made the statements she attributed to him in the article. The court may reconsider its decision to quash the subpoena with respect to the notes and reporting material if Ward is unable to answer a question posed to her because she does not remember details of Howsie's interview and would need to refer to her notes or reporting material to refresh her recollection about the interview. Upon request of Siroky, the court will conduct an *in camera* review of Ward's notes and reporting material to determine whether the qualified reporter's privilege was overcome and whether they should be turned over to Siroky. See Kitzmiller, 379 F. Supp. 2d at 688 (conducting an *in camera* review of documents requested from a reporter to determine whether the privilege had been overcome).

### IV. Conclusion

The motion to squash the subpoena (ECF No. 117) will be granted in part and denied in part. The motion will be denied with respect to Ward's testimony about whether Howsie made the statements she attributed to him in her article. Siroky may conduct the deposition of Ward. The

deposition must take place in this court's jury room. The deposition will be limited to two hours[10] and may only address whether Howsie made the statements attributed to him by Ward in The Post-Gazette article at issue in this opinion. The parties, Ward, and The Post-Gazette shall contact the court to select a date on which to hold the deposition so that the court is available to intervene, if necessary.

The motion to quash will be granted with respect to Siroky's request for Ward's interview notes and reporting material.

An appropriate order will be entered.

BY THE COURT,

Dated: March 26, 2018

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge

---

[10] This temporal limitation addresses any concern about the extent of cross-examination; indeed, the deposition questions must be confined to the issue identified, i.e., whether Howsie made the statements attributed to him by Ward in her article.